Daniel J. Maher
Edward J. Reilly
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Phone: (202) 551-4737 (Maher)
Email: Maherd@sec.gov (Maher)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| *Plaintiff*, : | |
| : | |
| **v.** : | **CASE NO.    2:23-CV-3201** |
| : | |
| **HAL D. MINTZ, and** : | |
| **SABBY MANAGEMENT LLC,** : | |
| : | **JURY TRIAL** |
| : | **DEMANDED** |
| : | |
| *Defendants*. : | |
| : | |
| : | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission"), for its Complaint against defendants Hal D. Mintz ("Mintz"), whose last known address is 7012 Fisher Island Drive, Miami Beach, Florida 33109, and Sabby Management LLC ("Sabby"), whose last known address is 115 Hidden Hills Drive, Spicewood, Texas 78669 (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.       This complaint arises from a long running fraudulent scheme involving abusive "naked" short selling, order mismarking, and other violative trading, orchestrated by Defendants Sabby Management LLC ("Sabby"), a registered investment adviser and recidivist, and its principal, Hal D. Mintz ("Mintz").  From at least March 2017 through May 2019, Mintz, a highly

experienced trader, through Sabby, used his knowledge to game the markets and carry out Defendants' fraudulent scheme by repeatedly circumventing trading rules involving at least 10 issuers on behalf of two private funds managed by Defendants ("the Private Funds").

2.     Defendants' fraudulent scheme involved at least two forms of abusive trading. First, Defendants knowingly or recklessly mismarked sales of securities as "long" even though the sales did not qualify as long sales because the Private Funds did not own and were not deemed to own the securities being sold and did not have a net long position in the securities being sold.  As a result, Defendants should have marked those sales as "short."  Failing to mark the sales correctly was a violation of applicable order marking rules.  Because Defendants' sales were actually short sales that they tried to disguise as long sales, and Defendants had not "located" (*i.e.*, borrowed, arranged to borrow, or had reasonable grounds to believe that the securities could be borrowed) the shares that they sold, the sales further failed to comply with the locate requirements of Regulation SHO.  17 C.F.R. § 242.200 – § 204.204.  Second, Defendants engaged in additional abusive trading in which they marked and sold shares "short" when they knew or were reckless in not knowing that they had not borrowed or located the shares.  These trades also failed to comply with the locate requirements of Regulation SHO.  Further, in each instance in which Defendants additionally failed to make timely delivery of shares, their trading also constituted "naked" short selling, which was a further violation of Regulation SHO, described in more detail below.

3.     Defendants engaged in this fraudulent trading scheme because it was more profitable than following the order marking and locate rules.  As explained in greater detail below, Defendants would not have been able to carry out their short sales, and thus could not have profited as they did, if they had followed the rules governing long and short sales.  As a

2

result of their misconduct, Defendants obtained at least $2 million in ill-gotten trading profits for themselves and the Private Funds.

4.     On occasion, Defendants additionally used their violative sales to deflate artificially the price at which Defendants were able to convert their securities into stock. Through these abusive sales, Defendants acquired more stock at a cheaper price.

5.     Defendants took multiple steps to conceal their fraudulent scheme and misconduct.  They knew or were reckless in not knowing their misconduct violated rules requiring traders to properly mark long sales and short sales and to obtain locates for short sales. Defendants repeatedly made false statements to the brokers executing their trades, including falsely representing that they had locates for their short sales when, in fact, they did not.  As well, Defendants repeatedly submitted fraudulent order instructions to the brokers, identifying their sales as "long" in an attempt to disguise their naked short sales and their short sales for which they had not obtained locates, when they knew that they were required to identify these orders as "short" sales.  But for these misrepresentations, the brokers would not have executed these trades since the trades failed to comply with Regulation SHO.

6.     In an additional attempt to hide their failure to obtain locates for their short sales and satisfy their settlement obligations, Defendants in some instances would acquire the required stock *after* their short sales, typically by purchasing the stock from the issuer or otherwise acquiring it through conversion of other securities.  Defendants knew or were reckless in not knowing that these practices failed to comply with applicable trading rules that require, with very narrow exceptions not applicable here, a short seller to locate the stock *prior* to the short sale.

7.     While Defendants were often able to conceal from the market their fraudulent trading scheme, on some occasions, Defendants were unable to deliver securities in time to

cover their short sales, causing "fails-to-deliver." Each instance in which Defendants'
mismarked long sales and shorts sales without locates resulted in fails-to-deliver, Defendants'
conduct also constituted naked short selling.

8.      As a result of the conduct described above and more fully below, Defendants
violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §
78j(b)] and Rules 10b-5 and 10b-21 thereunder [17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.10b-
21]. Additionally, Sabby violated Sections 204 and 206(4) of the Investment Advisers Act of
1940 ("Advisers Act") [15 U.S.C. §§ 80b–4 and 80b–6] and Rules 204-2 and 206(4)-7
thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7], and Mintz aided and abetted those
violations.

9.      Without an injunction, Defendants are likely to continue to violate the federal
securities laws.

10.     The Commission seeks permanent injunctions; disgorgement of ill-gotten gains
derived from the conduct alleged in the Complaint plus prejudgment interest thereon; and civil
money penalties.

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Sections 21(d) and 21(e) of the
Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] and Sections 209(d) and 209(e) of the Advisers
Act [15 U.S.C. §§ 80b-9(d) and (e)].

12.     The Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of
the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa] and Sections 209(d), 209(e), and 214 of the
Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

13.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue is proper in the District of New Jersey pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because many of the acts and transactions constituting violations of the Exchange Act and the Advisers Act occurred in this district, including materially false and misleading order instructions and other materially false and misleading representations made to brokers.  In addition, during the relevant period, Sabby's principal place of business was in this district.

## THE DEFENDANTS

15.     Hal D. Mintz, age 52, is a resident of Miami, Florida.  During the relevant period, he was the principal and managing partner of Sabby Management LLC and, at all times, had primary responsibility for making investment decisions, including daily securities trading decisions, for the Private Funds described below.  He has served in this capacity since the firm was established in 2011.  Because of his position, Sabby is liable for Mintz' conduct alleged herein.  Mintz is a highly experienced, prolific trader and has worked in the securities industry since at least 1996.

16.     Sabby Management LLC, is a Delaware limited liability company established in 2011.  During the relevant period, it maintained a principal office in Saddle River, New Jersey, and had approximately five employees.  It has been registered as an investment adviser with the Commission since July 12, 2013.  Its business consists primarily of managing two private funds: the Sabby Healthcare Master Fund, LTD and the Sabby Volatility Warrant Master Fund, LTD (collectively "the Private Funds").  Defendants are compensated for their management of the

Private Funds through management fees as well as performance fees tied to the investment returns earned by the Private Funds.  Sabby has previously been sanctioned by the Commission in connection with improper short sales.  On October 14, 2015, the Commissioned instituted a settled cease-and-desist proceeding finding that Sabby violated Rule 105 of Regulation M of the Exchange Act on two occasions.  The Commission imposed a cease-and-desist order, disgorgement of $184,747.10 plus prejudgment interest, and a civil penalty of $91,669.95.

## OTHER RELEVANT ENTITIES

17.     Sabby Healthcare Master Fund, LTD. (the "Healthcare Fund") is a Cayman Islands entity established in 2011.  It is a master hedge fund managed by Sabby and has two feeder funds, one onshore and the other in the Cayman Islands.  At the beginning of the relevant period, it had approximately $400 million in gross asset value.  As of its most recent public disclosure, it had approximately $16 million in gross asset value and 28 beneficial owners.  During the relevant period, the Healthcare Fund's trading strategies and investment decisions were made by Defendants.  As of September 30, 2022, Mintz held a 7.3% interest in the Healthcare Fund.

18.     The Sabby Volatility Warrant Master Fund, LTD. (the "Warrant Fund") is a Cayman Islands entity established in 2011.  It is a master private equity fund managed by Sabby, with three feeder funds, two in the Cayman Islands and one onshore.  At the beginning of the relevant period, it had approximately $60 million in gross asset value.  As of its most recent public disclosure, it had approximately $182 million in gross asset value and 73 beneficial owners.  During the relevant period, the Warrant Fund's trading strategies and investment decisions were made by Defendants.  As of September 30, 2022, Mintz held a 39.9% interest in the Healthcare Fund.

19.     Issuer 1 is a publicly traded Nevada corporation with its principal place of business in Palo Alto, California.  During the relevant period, Issuer 1's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Stock Market LLC.  It files annual reports with the Commission pursuant to Sections 13 and 15(d) of the Exchange Act.

20.     Issuer 2 was a publicly traded Washington corporation with its principal place of business in San Diego, California.  During the relevant period, Issuer 2's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange.  It filed annual reports with the Commission pursuant to Sections 13 and 15(d) of the Exchange Act.  Subsequent to the relevant period, Issuer 2 completed a merger with another company to form a new company under a different name.

21.     Prime Broker 1 is a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund.

22.     Prime Broker 2 is a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund.

23.     Executing Broker-Dealer A is a broker-dealer used by Defendants to execute trades on behalf of both the Warrant Fund and the Healthcare Fund.

## BACKGROUND ON REGULATION SHO

24.     Regulatory requirements applicable to short sales of equity securities are generally found in Regulation SHO, 17 C.F.R. § 242.200 – § 204.204, which the Commission adopted to address its concerns regarding persistent fails to deliver and potentially abusive "naked" short selling.  A "naked" short sale generally refers to selling short without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard

settlement period. All sellers of securities should promptly deliver, or arrange for delivery of, securities and all buyers of securities have a right to expect prompt delivery of securities purchased. In enacting Regulation SHO, the Commission was concerned about the negative effect that fails to deliver may have on the markets and shareholders. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending, and sellers that fail to deliver securities on the settlement date may attempt to use this additional freedom to engage in trading activities to improperly depress the price of a security.

## TERMINOLOGY USED IN THIS COMPLAINT

### *Regulation SHO*

25.        Rule 200(g) of Regulation SHO requires broker-dealers to mark all sale orders of equity securities as "long," "short," or "short exempt." 17 C.F.R. § 242.200(g).

26.        Before accepting a short sale order or effecting a short sale for its own account, Rule 203(b)(1) of Regulation SHO requires (with very limited exceptions not applicable here) a broker-dealer to locate the securities being sold; *i.e.*, the broker-dealer must: (i) borrow the securities; (ii) enter into a bona fide arrangement to borrow the securities; or (iii) have reasonable grounds to believe that the securities can be borrowed so that they can be delivered on the date delivery is due. This provision is generally referred to as the "locate" requirement under Regulation SHO. The source of the locate must be documented. Broker-dealers usually charge customers a fee for borrowing securities.

27.        Ownership of a security convertible into, or exchangeable for, the security being

sold, is not a borrow or arrangement to borrow the security being sold.  Ownership of a security convertible into, or exchangeable for, the security being sold would also not provide reasonable grounds to believe the security being sold can be borrowed.

### *Deemed to Own*

28.     Under Regulation SHO, a seller is "deemed to own" a security only if it has a net long position in a security.  17 C.F.R. § 242.200(c).

29.     A seller may be deemed to own a security if, for example, (i) the person purchased, or has entered into an unconditional contract, binding on both parties thereto, to purchase it, but has not yet received the security; or (ii) the person owns a security convertible into or exchangeable for it *and has tendered* such security for conversion or exchange.

30.     For purposes of order marking rules under Regulation SHO, a seller of convertible securities (*i.e.*, other securities that are convertible into the underlying stock being sold) is not "deemed to own" the underlying common stock until the seller has tendered such convertible security for conversion or exchange.

### *Short Selling*

31.     A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor.  The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender.  In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

32.     Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

### Naked Short Selling

33.     In a "naked" short sale, a seller does not borrow or arrange to borrow securities intime to make delivery to the buyer within the standard settlement period.

### Long Selling

34.     "Long selling" occurs when the seller owns the security being sold and has a reasonable expectation that he can deliver the security in time for settlement.

35.      Under Regulation SHO, an order to sell may be marked "long" only if two conditions are met.  *First*, the seller must be "deemed to own" the security pursuant to Rule 200(a) through (f) of Regulation SHO.  17 C.F.R. § 242.200.  A seller is deemed to own a security only to the extent that it has a net long position in a security.  *Second*, to mark a sale long, the broker-dealer must either: (i) have possession or control of the security to be delivered; or (ii) reasonably expect that the security will be in its physical possession or control no later than the settlement of the transaction.  17 C.F.R. § 242.200(g).  If a seller does not deliver the security in time for settlement, a buyer may not get what it purchased in a timely manner, eroding trust and confidence in the markets, and potentially depriving market participants of the benefits of their bargain.

### Failure to Deliver

36.     Regulation SHO was designed, in part, to reduce "failures to deliver," which occur when a seller fails to deliver securities that it has sold by the settlement date.  Failures to deliver may negatively impact the market and shareholders.  *See Amendments to Regulation SHO,* Exch. Act Rel. No. 34-60388 (July 27, 2009).  Further, sellers that fail to deliver securities

on the settlement date may, as here, attempt to use this additional freedom to engage in trading activities to depress improperly the price of a security.  *See id*. at 6-7.  Further, by not borrowing securities and, therefore, risking that it will not be able to make delivery within the standard settlement period, the seller benefits by not incurring the costs of borrowing shares.

<u>**FACTUAL ALLEGATIONS**</u>

**I.    SABBY'S OPERATIONS**

37.    As managing partner of Sabby, Mintz had primary responsibility for making investment decisions for the Private Funds.  Sabby's investment strategy involved, in part, participating in secondary offerings by issuers, which frequently included common stock and/or convertible securities of the issuer.

38.    Mintz also had primary responsibility under Sabby's policies and procedures for knowing whether the Private Funds had a net short or long position in an issuer's stock and whether each sale of an issuer's stock was a short sale or a long sale.  In addition, he was responsible for ensuring that Sabby's trading records were consulted in order to confirm this information before submitting any trades.

39.    In particular, before a short sale order could be placed, Sabby's policies and procedures required Mintz or his trading designee to consult Sabby's trading records, including (i) a list of available locates provided on a daily basis from Prime Broker 1 ("Locate Availability List"); (ii) Sabby's trading log to see how many shares of the issuer had been sold short so far that day; and (iii) short sales executed through brokers not reflected in Sabby's trading log.

40.    Mintz was also responsible for reporting any instance where a locate was not properly obtained, for reviewing all short sale reports for accuracy, and for ensuring that all orders, including short sale orders, were marked correctly.

## II.    VIOLATIVE SHORT SELLING IN THE SECURITIES OF ISSUER 1

41.    In June 2018, Defendants engaged in a scheme to circumvent Regulation SHO requirements in connection with the short sales of millions of shares of the common stock of Issuer 1.  As more fully described below, Defendants' scheme including short selling without having locates in place and naked short selling in which they not only failed to have locates but also failed to timely deliver the securities being sold.  Defendants' goals were two-fold.  First, Defendants knowingly or recklessly used their violative short selling to push down artificially the price of Issuer 1's stock so that Defendants could lower the price at which Defendants were able to exercise their Issuer 1 convertible securities, thus obtaining more stock upon conversion.

42.    Second, regardless of whether Defendants succeeded in driving down Issuer 1's stock price by their improper short selling, Defendants knew or were reckless in not knowing they could profit additionally from selling Issuer 1's stock in violation of Regulation SHO's locate requirements.  As set forth more fully below, their fraudulent trading scheme worked as follows:  first, they entered into a securities purchase agreement with Issuer 1 on behalf of the Warrant Fund that, for a brief period, effectively allowed Defendants to exercise convertible preferred securities in exchange for Issuer 1's stock at an approximately 20% discount to the market price.  Then, *prior to* exercising the convertible securities, they entered short sales orders without first obtaining a locate, circumventing Regulation SHO.  Almost immediately *after* those short sales, they executed their conversion rights to acquire Issuer 1 stock and attempted, albeit unsuccessfully, to use those shares to cover their short sales.  In this manner, Defendants locked in an approximate 20% spread.  In other words, by short selling without first obtaining a locate, they effectively were able to sell at market price and then acquire the shares at a 20% discount to market price, earning substantial illicit proceeds.  Defendants would not have been able to do this

if they had followed the rules that required locates for their short sales because they would not have been able to obtain locates in sufficient quantity, if at all.

43.     As part of the scheme, Defendants knowingly or recklessly submitted materially false and misleading order instructions to executing broker-dealers for the long sale of millions of shares of Issuer 1's common stock on behalf of the Warrant Fund when it did not have a net long position in the stock.  Defendants also submitted order instructions for the short sale of millions of shares of Issuer 1's common stock on behalf of the Warrant Fund while knowingly or recklessly making materially false and misleading representations to executing broker-dealers that, through their prime brokers, Defendants had obtained locates for Issuer 1's common stock in connection with the short sales.

44.     After making these materially false and misleading statements in connection with their short sales, Defendants tendered for conversion millions of shares of convertible Issuer 1 securities.  As described more fully below, the fraudulent scheme allowed Defendants to generate hundreds of thousands of dollars in ill-gotten gains for the Warrant Fund and led to Defendants' failure to deliver millions of shares of Issuer 1.

**Defendants' Fraudulent Trading and Ill-gotten Profits**

45.     In April 2018, Defendants, on behalf of the Warrant Fund, entered into a securities purchase agreement with Issuer 1 through which Defendants acquired preferred securities that could be converted into Issuer 1's common stock at a conversion price of $0.46 per share.  The agreement contained a provision that, on June 25, 2018, the conversion price of the preferred securities would be adjusted to 80% of the volume-weighted average price ("VWAP") of Issuer 1's common stock on the preceding trading day, June 22, 2018 ("the reset provision").

46. The reset provision gave Defendants a financial incentive to push down the price of Issuer 1's common stock before June 22, 2018 in order to receive more common stock upon conversion.

47. This was a strategy Defendants had employed previously and which Mintz explained in a February 2018 exchange with a representative of an executing broker-dealer in connection with Defendants' trading in another security:

> MINTZ: the deal that was just done that had a pricing mechanism
> MINTZ: that I made
> MINTZ: that for 5 days
> MINTZ: we got the lowest daily vwap [volume-weighted average price] minus 10%
> MINTZ: so incentive was to sell as much as possible
> MINTZ: during that point
> MINTZ: set a low price
> MINTZ: for our shares and warrants
> MINTZ: then let it go back up
> MINTZ: to monetize the warrants
> MINTZ: that we got at 5.3c
> MINTZ: stock was 40c predeal
> MINTZ: so now that pricing is set
> MINTZ: not going to be slamming stock

48. With two trading days remaining before the reset provision took effect, Defendants intentionally began naked short selling Issuer 1's common stock, putting downward pressure on Issuer 1's stock price.

49. On June 21, 2018, the Warrant Fund began the day with a net long position of 286 shares of Issuer 1's common stock. Defendants knew or were reckless in not knowing about the Warrant Fund's net long position, as it was reflected in Sabby's contemporaneous trading records, and Sabby's policies required Mintz to know this information before placing trades. Throughout the day, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers materially false and misleading order instructions for the long sale of 1,126,033 shares

of Issuer 1's common stock that executed at prices between approximately $0.29 and $0.33 per share.

50.     Defendants knew, or were reckless in not knowing, that the sale of all but 286 shares should have been marked as short sales because the Warrant Fund did not have a sufficient net long position in the common stock of Issuer 1 at the time Defendants submitted the orders.

51.     That same day, June 21, 2018, Defendants, on behalf of the Warrant Fund, submitted order instructions to executing broker-dealers for the short sale of an additional 569,184 shares of Issuer 1's common stock that executed at prices between approximately $0.29 and $0.30 per share.  Defendants falsely represented to the executing broker-dealers that Defendants had obtained locates for Issuer 1's common stock in connection with these short sales.  At the time, Defendants knew or were reckless in not knowing that they had not located any shares available to be borrowed, as reflected in Sabby's contemporaneous trading records.

52.     Defendants' trading comprised 52% of trading in Issuer 1's common stock on June 21, 2018, and the price of Issuer 1's stock fell from $0.34 to $0.29 per share over the course of the day, a 14.7% drop

53.     On June 22, 2018, the Warrant Fund began the day with a net short position in Issuer 1's common stock of 1,694,931 shares.  Throughout the day, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers order instructions for the long sale of 3,288,203 shares of Issuer 1's common stock that executed at prices between approximately $0.18 and $0.34 per share.  As Defendants knew or were reckless in not knowing, these instructions were materially false and misleading in designating the sales as "long" sale orders,

rather than short sales, because the Warrant Fund did not have a net long position in Issuer 1's common stock at the time Defendants submitted the orders.

54.     That same day, June 22, 2018, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers order instructions for the short sale of an additional 3,991,688 shares of Issuer 1's common stock that executed at prices between approximately $0.19 and $0.33 per share.  Defendants made materially false and misleading representations to the executing broker-dealers in the order instructions that Defendants had obtained locates for Issuer 1's common stock in connection with these short sales, when Defendants knew or were reckless in not knowing that they had not located any shares available to be borrowed, as reflected in Sabby's contemporaneous trading records.

55.     Defendants' trading comprised 42% of trading in Issuer 1's common stock on June 22, 2018, and the price of Issuer 1's stock fell from $0.31 to $0.19 per share over the course of the day, a 38.7% drop.  After Defendants' trading on June 21 and 22, 2018, the Warrant Fund had a net short position of 8,974,822 shares in Issuer 1's stock.

56.     After the close of trading markets on June 22, 2018, Defendants calculated the adjusted conversion rate for the Warrant Fund's Issuer 1 preferred securities – based on 80% of VWAP on June 22, 2018 – to be $0.1779 per share, down from the original rate of $0.46 per share.

57.     At or around 5:31 PM Eastern Time on June 22, 2018, Defendants, on behalf of the Warrant Fund, submitted a conversion notice to Issuer 1 to convert $1,797,017 worth of preferred securities into 10,101,280 shares of Issuer 1 common stock at a conversion rate of $0.1779 per share.  The effective date of the conversion was June 25, 2018.

58.     Defendants intended to use these shares to satisfy the delivery obligations for their June 21 and 22, 2018 sales of Issuer 1 common stock and to try to conceal their violative short sales for which they had failed to obtain locates.  However, as Defendants knew or were reckless in not knowing all along, the use of these converted shares to cover their sales would not and did not in any way cure their violative trading.  Delivery of those shares did not cure the fact that they had mismarked their trades as long sales when they were not "deemed to own" the shares or did not have a net long position in Issuer 1 at the time they submitted the mismarked orders.  Similarly, delivery of those shares did not cure their violations of the locate requirements of Regulation SHO because they had placed short sales without actually having obtained a locate, and as Defendants knew or were reckless in not knowing, they could not use the fact that they held convertible securities that could be exchanged for Issuer 1 stock to satisfy the locate requirement.

59.     If Defendants had converted $1,797,017 worth of Issuer 1 preferred securities prior to the adjustment of the conversion rate, effective June 25, 2018, the conversion would have yielded only 3,906,560 shares of Issuer 1 common stock.  Instead, by tendering the convertible securities *after* Issuer 1's stock price plummeted by over 60% and the conversion rate was adjusted downward, Sabby's conversion of $1,797,017 worth of preferred securities at the price of $0.1779 per share resulted in approximately 10.1 million shares of common stock.

60.     Beyond the additional shares Defendants obtained from the decline in Issuer 1's stock price between June 21 and June 22, Defendants locked in a 20% profit through their short selling without obtaining locates in violation of the requirements of Rule 203(b)(1) of Regulation SHO.  As explained above, the conversion price of Defendants' preferred Issuer 1 securities was adjusted downward to 80% of VWAP on June 22, 2018, effectively giving

Defendants a right to convert these securities in exchange for Issuer 1 stock at an approximate

20% discount to the market price.  Defendants knowingly or recklessly chose to sell short shares

of Issuer 1 on June 21 and 22 without obtaining locates, and, immediately *after* those sales,

Defendants exercised their conversion rights in exchange for the Issuer 1 shares needed to cover

their short sales.  Through this fraudulent scheme, Defendants, in effect, sold short shares of

Issuer 1 at market price and subsequently acquired shares at an approximate 20% discount to

the market price, earning substantial illicit proceeds of $480,000 for the Warrant Fund.

Defendants profited personally in connection with this trading from the management and

performance fees they obtained from managing the Warrant Fund.  As well, Mintz profited from

his ownership interest in the Warrant Fund.

### Defendants' False and Misleading Statements to Executing Broker-Dealer A

61.     Defendants made repeated material misrepresentations to Executing Broker-

Dealer A and engaged in other deceptive conduct described below to try to conceal their illegal

trading.  Defendants knew or were reckless in not knowing that Executing Broker-Dealer A

relied on their false and misleading statements in executing their abusive naked short sales.

62.     Between June 21 and 22, 2018, Defendants made repeated misrepresentations to

Executing Broker-Dealer A regarding their orders for the sale of Issuer 1's securities.  After

Defendants' initial submission on June 21, 2018, of false and misleading order instructions to

Executing Broker-Dealer A for the long sale of one million shares of Issuer 1, Mintz had a

telephone call with representatives of Executing Broker-Dealer A.  In response to questioning by

the representatives of Executing Broker-Dealer A about the validity of how the trade was

marked, Mintz conceded that the improperly marked long sale should have been marked as a

short sale, which Executing Broker-Dealer A changed to a short sale order for one million shares

of Issuer 1.  Subsequently, Defendants withdrew a second false long sale order and resubmitted the order as a short sale order for one million shares of Issuer 1.  By designating the sales as short sales, however, Defendants were obligated under Regulation SHO to obtain a locate.

63.     Later, on June 21, 2018, a representative of Executing Broker-Dealer A made multiple requests to Defendants to confirm the source of their locate for both one million short sales orders.  Initially, Mintz falsely stated that the locate for the first order was provided by Prime Broker 1, and that the locate for the second order was provided by Prime Broker 2.  Later that day, he reversed and falsely stated that Prime Broker 2 provided the locate for the first order and Prime Broker 1 provided the locate for the second.

64.     Because Sabby's policies required Mintz to verify a security's locate availability before short selling and, as reflected in Sabby's contemporaneous trading records, there were no locates, Mintz knew or was reckless in not knowing that neither prime broker had locates available for *any* shares of Issuer 1.

65.     On the morning of June 22, 2018, a Director of Compliance of Executing Broker-Dealer A sent an email to Sabby requesting contact information for Prime Broker 1 and Prime Broker 2 or, alternatively, documentation confirming that Defendants had obtained locates from Prime Broker 1 and Prime Broker 2 in connection with Defendants' short sales.

66.     Later that day, the Director of Compliance of Executing Broker-Dealer A attempted to speak with a representative of Sabby, but their call was disconnected.  Shortly after the call, at around 12:30 PM, the Director of Compliance of Executing Broker-Dealer A sent an email to Defendants again demanding documentation of the locates or documentation showing that Defendants had tendered the preferred securities of Issuer 1 for conversion *prior* to submitting the short sale orders.

67.     At or around 6:06 PM on Friday, June 22, 2018, in an attempt to mislead Executing Broker-Dealer A on the sequence of events, a representative of Sabby sent an email to the Director of Compliance of Executing Broker-Dealer A that included a copy of Sabby's conversion notice tendered to Issuer 1 at or around 5:31 PM, well *after* Defendants had submitted the short sale orders.

68.     Upon reviewing this email on Monday, June 25, 2018, the Director of Compliance of Executing Broker-Dealer A recognized that the conversion notice failed to satisfy his request for documentation of Defendants' locates *or* documentation showing that Defendants had tendered the preferred securities of Issuer 1 for conversion *prior* to submitting the short sale orders.  Subsequently, on June 25, 2018, the Director of Compliance sent another email to Defendants requesting evidence of locates *prior* to the sales.  Defendants ignored this request.

69.     On the morning of June 26, 2018, a representative of Executing Broker-Dealer A sent another email to Defendants, renewing the Director of Compliance's request for documentation.  Shortly after, a representative of Sabby responded by email, stating, "Shares will be delivered today. Thank you for your patience."

70.     However, Defendants failed to deliver shares of Issuer 1's common stock until June 28, 2018, and failed to satisfy their settlement obligation in connection with their short sales of Issuer 1's common stock on June 21 and 22, 2018.  As a result of this late delivery, by June 27, 2018, the Warrant Fund's abusive naked short sales caused fails-to-deliver of approximately nine million shares of Issuer 1.

71.     In testimony, Mintz has admitted that he was aware: (1) of the Warrant Fund's opening position in the common stock of Issuer 1 on June 21 and 22, 2018 at the time of the

relevant trades (*i.e.*, that the Warrant Fund had only 286 shares of Issuer 1 on June 21 and a net short position of 1,694,931 shares on June 22); (2) that Defendants had not tendered for conversion the convertible securities prior to placing the trades; and (3) that Defendants' trades in Issuer 1 were mismarked.

### III.    VIOLATIVE SHORT SELLING IN THE SECURITIES OF ISSUER 2

72.     In January 2018, Defendants engaged in a fraudulent scheme to circumvent Regulation SHO by selling short tens of thousands of shares of Issuer 2's common stock without obtaining locates.  As more fully described below, Defendants intended to profit by short selling Issuer 2's common stock without obtaining locates and subsequently acquiring the common stock of Issuer 2 at a cheaper price than if they had followed the locate requirements of Rule 203(b)(1) of Regulation SHO.

73.     Between January 8 and 9, 2018, Defendants submitted instructions to executing broker-dealers for the short sale of Issuer 2's common stock on behalf of the Private Funds while knowingly or recklessly making materially false and misleading representations that they had obtained locates for shares of Issuer 2's common stock in connection with these short sales.

74.     *After* submitting the violative short sale orders, on January 10, 2018, Defendants entered into a securities purchase agreement with Issuer 2 through which Defendants, on behalf of the Private Funds, acquired one million shares of Issuer 2's common stock.  Defendants attempted to use these shares to satisfy the delivery obligations and conceal their failure to have obtained locates for their short sales, but the shares were not delivered until January 12, 2018, and Defendants caused fails-to-deliver of thousands of shares of Issuer 2.  As Defendants knew or were reckless in not knowing, the use of after-acquired shares to cover their short sales for

which they had not obtained a locate at the time of their short sale order could not cure their

failure to comply with the locate requirements of Rule 203(b)(1) of Regulation SHO.

### The January 8 and 9, 2018 Trading

75.    On January 8, 2018, the Warrant Fund and the Healthcare Fund began the day

with net short positions in Issuer 2 of 49,333 and 60,870 shares, respectively, as reflected in

Sabby's contemporaneous trading records.

76.    At 6:30 AM Eastern Time on that day, Defendants were informed by Prime

Broker 1 that their request for a 250,000 share locate for Issuer 2's shares was denied.

77.    Notwithstanding this denial, at 8:38 AM, Defendants knowingly or recklessly

submitted to an executing broker-dealer two short sale orders – a short sale of 14,147 shares of

Issuer 2 on behalf of the Warrant Fund and another short sale of 14,148 shares of Issuer 2 on

behalf of the Healthcare Fund, for a total of 28,295 shares of Issuer 2 to be sold short.

78.    As part of the order instructions, Defendants falsely represented to the executing

broker-dealer that Prime Broker 2 had provided a locate in connection with the short sales.  As

Defendants knew or were reckless in not knowing, at the time of the order, no locate had been

provided to Defendants by either Prime Broker 1 or Prime Broker 2.

79.    At 9:31 AM, Defendants again requested a locate from Prime Broker 1 and were

denied.

80.    At 9:32 AM, however, Prime Broker 2 granted Defendants a locate for 30,000

shares of Issuer 2.  While enough to cover the earlier aggregate 28,295 short sale order of Issuer

2's shares on behalf of the Private Funds, the locate was untimely given that it was granted *after*

the short sale orders had been placed.

81.     At 12:23 PM, Prime Broker 2 granted Defendants an additional locate for 25,000 shares of Issuer 2.  Defendants immediately submitted two short sale orders to an executing broker dealer for 25,000 shares on behalf of each Fund, for a total of 50,000 shares to be sold short.  As Defendants knew or were reckless in not knowing, while Prime Broker 2's 25,000 share locate was sufficient to cover one of the Fund's short sales, it was insufficient to cover both.

82.     At 4:40 PM, Defendants submitted a third short sale order instruction to an executing broker-dealer on behalf of the Healthcare Fund for yet an additional 25,000 shares of Issuer 2.  However, only 2,594 shares were actually sold at $1.95 per share.  As part of the order instructions, Defendants again falsely represented that Prime Broker 2 had provided a locate in connection with the short sales, even though they knew or were reckless in not knowing that the locates provided by Prime Broker 2 were insufficient to cover Defendants' short sales.

83.     By placing short sale orders prior to receiving any locates or without sufficient locates, and then failing to deliver shares on a timely basis, Defendants naked short sold 25,889 shares of Issuer 2.

84.     On January 9, 2018, the Warrant Fund and the Healthcare Fund began the day with net short positions of 88,480 and 102,615 shares, respectively, in Issuer 2.

85.     As had occurred on the previous day, Defendants were informed at 6:30 AM by Prime Broker 1 that their request for a locate of 250,000 shares of Issuer 2 was denied.

86.     At 7:54 AM, Defendants requested a locate for Issuer 2's shares from Prime Broker 2 and were also denied.

87.     At 7:57 AM, Defendants submitted another request to Prime Broker 1 and were granted a locate of 5,000 shares of Issuer 2.

88.     At 8:00 AM, a Sabby employee informed Mintz that a locate for 5,000 shares of Issuer 2 had been granted.

89.     Despite knowing that only 5,000 shares of Issuer 2 had been located, at 8:02 AM Defendants submitted to an executing broker-dealer order instructions to sell short 450,000 shares of Issuer 2 without sufficient locates on behalf of the Healthcare Fund, resulting in the sale of 1,400 shares that executed at prices between $1.50 and $1.80 per share.

90.     At the same time, Defendants submitted a separate order on behalf of the Warrant Fund for the short sale of 250,000 shares without sufficient locates to an executing broker-dealer, resulting in the sale of 1,674 shares that executed at approximately $1.52 per share.

91.     In the instructions for both orders, Defendants misleadingly identified Prime Broker 1 as the source of the locate for the 450,000 short sale order and the 250,000 short sale order, even though Defendants knew or were reckless in not knowing that Prime Broker 1 had only provided a limited locate of 5,000 shares.

92.     At 11:02 AM, a Sabby employee informed Mintz that the Warrant Fund and Healthcare Fund had not obtained any additional locates for Issuer 2's securities.  Despite knowing this, Defendants nevertheless submitted additional order instructions to executing broker-dealers for short sales in Issuer 2's stock between 12:41 PM and 1:21 PM.  In the order instructions, Defendants again, acting knowingly or recklessly, falsely represented that Prime Broker 1 had provided locates.  These orders resulted in 35,216 shares sold short by Defendants, with no locate, that executed at a price of approximately $1.52 per share.

93.     On the following day, January 10, 2018, Defendants, on behalf of the Private Funds, entered into a securities purchase agreement with Issuer 2 to buy one million shares of the company's common stock at $1 per share.  Defendants attempted to use these shares to

settle their short sales without locates executed on January 8 and 9, 2018.  However, as Defendants knew or were reckless in not knowing, regardless of the subsequent securities purchase agreement, Defendants did not have sufficient locates at the time of their short sale orders and their trades were in violation of the locate requirements of Regulation SHO.

94.     Despite trying to use the securities obtained through the securities purchase agreement to settle their short sales, by January 11, 2018, Defendants' short sales in Issuer 2 caused fails-to-deliver of at least 33,000 shares of Issuer 2.

95.     As described above, Defendants naked sold short over 30,000 shares of Issuer 2 that were executed at prices between $1.50 and $1.95 per share, and subsequently purchased Issuer 2 shares at a price of $1 per share.  By naked short selling Issuer 2's common stock at market price and subsequently acquiring shares of Issuer 2 through the securities purchase agreement at a substantially cheaper price per share, Defendants gained ill-gotten proceeds of approximately $134,000, and net profits of $49,000 for the Private Funds.  Defendants profited personally in connection with this trading from the management and performance fees they obtained from managing the Private Funds.  As well, Mintz profited from his ownership interest in the Private Funds.

## IV.     ADDITIONAL ABUSIVE TRADING

96.     Defendants engaged in similar abusive trading in the securities of at least eight additional issuers.

97.     The frequency of Defendants' abusive trading and the similarity of the misconduct across Defendants' trading, as well as Sabby's prior history of short sale violations in connection with Rule 105 of Regulation M, demonstrate that these violations were not errors, but, in fact, part of a fraudulent scheme to circumvent trading rules.

98.     Defendants' additional abusive trading, the details of which are set forth more fully in Appendix A to this Complaint, took place between March 15, 2017 and May 6, 2019.  As set forth in Appendix A, in each instance, Defendants knowingly or recklessly either submitted (a) materially false and misleading trade order instructions to executing broker-dealers for long sales on behalf of the Private Funds when the Private Funds did not have a net long position in the security and were not deemed to own the securities; or (b) submitted short sale trade instructions to executing broker-dealers for short sales on behalf of the Private Funds while making materially false and misleading representations that Defendants had obtained locates in connection with the short sales when in fact they had not obtained locates.

99.     Defendants engaged in this fraudulent trading scheme because it was profitable to do so and more profitable than following the requirements of Regulation SHO.  Defendants profited from the difference between the higher price of their abusive sales (naked short sales; short sales without locates; and/or mismarked long sales) and the cheaper price they subsequently paid to acquire the stock or exercise convertible securities in exchange for stock. Had Defendants complied with the applicable trading rules – including owning a security before submitting a long sale order or borrowing or locating a security before submitting a short sale order – they would not have secured the same profits.  As a result of their fraudulent scheme, Defendants obtained at least $2 million in illegal trading profits for themselves and the Private Funds.

## V.     SABBY'S INADEQUATE BOOKS AND RECORDS

100.     Pursuant to Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2], Sabby, as an investment adviser, was required to make and keep certain books and records related to its advisory business.  Among other records, Rule 204-

2 requires investment advisers to keep accurate records relating to orders to purchase or sell any security.

101.    During the relevant period, Sabby failed to keep accurate books and records with respect to certain orders to sell securities, as detailed above, when Defendants mismarked those sales as long when those sales should have been marked as short and when Defendants represented in their order instructions that they had obtained locates for short sales, when in fact Defendants had not.

102.    Mintz, having primary oversight over investment decisions, including daily securities trading decisions, for the Private Funds, was responsible for the entry of these inaccurate orders and knew or was reckless in not knowing that the information was false, and as such, aided and abetted Sabby's violations.

## VI.    SABBY'S INADEQUATE COMPLIANCE POLICIES AND PROCEDURES

103.    Pursuant to Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], Sabby was required to have policies and procedures reasonably designed to prevent violations of the Advisers Act and to implement those policies and procedures.

104.    However, during the relevant period, Sabby failed to enforce and otherwise implement compliance with its existing procedures, including those designed to ensure accurate books and records.  As alleged above, Defendants continuously mismarked short sale orders as long sales and inaccurately represented in their order instructions that they had locates for short sales when they did not.

105.    Sabby's policies and procedures relating to Regulation SHO assigned Mintz, or his trading designee, responsibility for determining whether the Private Funds had a net long or

short position in a security.  This responsibility included determining prior to each sale whether it was a long or short sale.

106.     Under Sabby's policies and procedures, Mintz was responsible as well for ensuring that Sabby's locate availability list, trading log, and other trading records were consulted before execution of any trades, and Mintz was responsible for reporting any instance where a locate was not properly obtained, for reviewing all short sale reports for accuracy, and for ensuring that all orders, including short sale orders, were marked correctly.

107.     Mintz, however, failed to implement and comply with these procedures and continuously created inaccurate trading records and submitted mismarked trades.  He therefore aided and abetted Sabby's compliance failures, including those related to its inadequate books and records.

108.     For its part, Sabby failed to implement procedures to ensure that Mintz complied with his obligations as set forth above and thus prevent violations of the Advisers Act

## THIS ACTION IS TIMELY FILED

109.     Defendants agreed to toll any statute of limitations applicable to the claims alleged herein during the period from December 2, 2022 through March 22, 2023 and the period from March 30, 2023 through June 30, 2023.


## CLAIMS FOR RELIEF

### First Claim for Relief
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Mintz and Sabby)

110.     Paragraphs 1 through 109 are realleged and incorporated by reference.

111.     Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of

interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent scheme described herein, including the knowing or reckless circumventing of Regulation SHO through mismarking orders, failing to obtain locates for short sales and failing to timely deliver shares as required by applicable rules, and submitting materially false and misleading order instructions and making other false and misleading statements to executing broker-dealers as described in paragraphs 41 through 99.

112.     By reason of the foregoing, Defendants violated and, unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Second Claim for Relief
### Violations of Section 10(b) of the Exchange Act and Rule 10b-21 Thereunder
### (Against Mintz and Sabby)

113.     Paragraphs 1 through 109 are realleged and incorporated by reference.

114.     The common stock of Issuer 1 and Issuer 2 are each a "security" within the meaning of Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] and are each an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act [15 U.S.C. § 78c(a)(11)].

115.     Defendants directly and indirectly, singly or in concert, knowingly or recklessly, in connection with the purchase and sale of securities, by use of the means and instrumentalities

of interstate commerce, or of the mails or of the facilities of a national securities exchange, have

submitted an order to sell an equity security while deceiving a broker or dealer, a participant of a

registered clearing agency, or a purchaser about their intention or ability to deliver the security

on or before the settlement date, and failed to deliver the security on or before the settlement

date, including, but not limited to Defendants' sales of Issuer 1's securities described in

paragraphs 41 through 71 and Issuer 2's securities described in paragraphs 72 through 95.

116.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert,

have violated and, unless restrained and enjoined, are reasonably likely to continue to violate

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-21 thereunder [17 C.F.R. §

240.10b-21].

### Third Claim for Relief
**Violations of Section 204 of the Advisers Act and Rule 204-2 Thereunder**
**(Against Sabby)**

117.    Paragraphs 1 through 109 are realleged and incorporated by reference.

118.    During the relevant period, Sabby acted as investment adviser to the Private

Funds.

119.    Accordingly, Sabby was legally obligated to "make and keep true, accurate and

current" books and records prescribed by the Commission relating to Sabby's investment

advisory business and to "furnish such copies" of those records as the Commission requires,

pursuant to Section 204(a) of the Advisers Act [15 U.S.C. § 80b–4] and Rule 204-2 thereunder

[17 C.F.R. §§ 275.204-2].

120.    Sabby, by use of the mails and the means and instrumentalities of interstate

commerce, directly or indirectly, created and maintained false books and records when, as

described above, Defendants submitted mismarked orders to sell securities long when those

orders should have been marked as short sales and when Defendants falsely represented in the order instructions that they had obtained locates for short sales, when in fact they had not.

121.     By reason of the foregoing, Sabby, directly or indirectly violated and, unless restrained and enjoined, is reasonably likely to continue to violate Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. §§ 275.204-2].

**Fourth Claim for Relief**
**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder**
**(Against Sabby)**

122.     Paragraphs 1 through 109 are realleged and incorporated by reference.

123.     Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] provides that it is unlawful for an investment adviser to engage in an act, practice, or course of business which is fraudulent, deceptive, or manipulative.  It further states that the SEC shall issue rules to define and prescribe measures to prevent such misconduct.  Rule 206(4)-7 issued under the Advisers Act [17 C.F.R. §275.206(4)-7] requires investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules.  Investment advisers must also review the adequacy of those policies and procedures and the effectiveness of their implementation, at least annually.

124.     As described in paragraphs 37 through 40, Sabby's policies and procedures assigned Mintz, or his trading designee, responsibility for determining whether the Private Funds had a net long or short position in a security.  In addition, Mintz was responsible for consulting Sabby's trading records before trade execution, ensuring trades were marked properly, reviewing short sale reports for accuracy, and reporting instances where a locate was not properly obtained.

125.     Sabby, however, failed to implement, as well as enforce compliance with its existing procedures, including those designed to ensure accurate books and records.  As alleged

31

above, Defendants, by use of the mails and the means and instrumentalities of interstate

commerce, directly or indirectly, continuously mismarked short sale orders as long sales and

inaccurately represented in their order instructions that they had locates for short sales when they

did not.

126.    By reason of the foregoing, Sabby, directly or indirectly violated and, unless

restrained and enjoined, is reasonably likely to continue to violate Section 206(4) of the Advisers

Act [15 U.S.C. § 80b-6] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

**Fifth Claim for Relief**
**Aiding and Abetting Violations of Sections 204 and 206(4) of the Advisers Act and**
**Rules 204-2 and 206(4)-7 Thereunder**
**(Against Mintz)**

127.    Paragraphs 1 through 109 are realleged and incorporated by reference.

128.    As a result of the conduct alleged herein, and in particular paragraphs 37 through

40 and paragraphs 100 through 108, Mintz aided and abetted Sabby's violations of Sections 204

and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7

thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7] by knowingly or recklessly providing

substantial assistance to Sabby, which, while registered as an investment adviser under Section

203 of the Advisers Act [15 U.S.C. § 80b-3], by use of the mails and the means and

instrumentalities of interstate commerce, directly or indirectly, engaged in fraudulent, deceptive,

or manipulative practices or courses of business, and failed to adopt and implement written

policies and procedures reasonably designed to prevent violations of the Advisers Act and the

rules thereunder by Sabby and its supervised persons.

129.    By reason of the foregoing, Mintz, directly or indirectly, aided and abetted, and,

unless restrained and enjoined, will again aid and abet violations of Sections 204 and 206(4) of

the Advisers Act [15 U.S.C. §§ 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

1.      Finding that Mintz and Sabby violated the federal securities laws and regulations alleged in this Complaint;

2.      Permanently restraining and enjoining Mintz and Sabby from violating the federal securities laws and regulations alleged in this Complaint;

3.      Ordering Mintz and Sabby to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), (7)];

4.      Ordering Mintz and Sabby to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and/or Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

5.      Granting such other and further equitable relief to the Commission as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.

Dated: June 12, 2023                    Respectfully submitted,


Of Counsel:                              _s/  Daniel J. Maher_____
Amy L. Friedman                          Daniel J. Maher (Mass. Bar ID No. 654711)
Christopher R. Mathews                   Edward J. Reilly (VA Bar ID No. 82562)
                                         U.S. SECURITIES AND EXCHANGE COMMISSION
                                         100 F Street NE
                                         Washington, DC 20549
                                         Phone: (202) 551-4737 (Maher)
                                         Email: Maherd@sec.gov (Maher)


## DESIGNATION OF AGENT FOR SERVICE UNDER LOCAL CIVIL RULE 101.1(f)

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the following designation for the receipt of service of all notices or papers in this action at the following address:

    United States Attorney's Office
    District of New Jersey
    Attention: David E. Dauenheimer
    Deputy Chief, Government Fraud Unit
    970 Broad Street, Suite 700
    Newark, NJ 07102-2534

Dated: June 12, 2023

                        Respectfully submitted,

                        _s/  Daniel J. Maher_____
                        Daniel J. Maher (Mass. Bar ID No. 654711)
                        Edward J. Reilly (VA Bar ID No. 82562)
                        U.S. SECURITIES AND EXCHANGE COMMISSION
                        100 F Street NE
                        Washington, DC 20549
                        Phone: (202) 551-4737 (Maher)
                        Email: Maherd@sec.gov (Maher)

**APPENDIX A**

| Issuer | Fund(s) Engaged in Trading | Locates | Number of Occasions Locates Denied | Total Naked Short Sales Orders With False Representations Concerning Locates | Short Sale Orders Mismarked as Long Sales | Total Naked Short Sales Shares & Proceeds | Profit After Acquiring Shares For Delivery | Date Range | Reset Provision |
|---|---|---|---|---|---|---|---|---|---|
| Issuer 1 | Warrant Fund and Healthcare Fund | | | 67,760 | 1,100 | 68,860 $438,578 | $202,810 | 3/15/2017 – 3/17/2017 | No |
| Issuer 2 | Warrant Fund and Healthcare Fund | | | 877,540 | 0 | 877,540 $1,470,521 | $347,270 | 7/26/2017 | No |
| Issuer 3 | Warrant Fund and Healthcare Fund | 45 | | 280,150 | 0 | 280,150 $727,818 | $307,390.75 | 7/28/2017 – 7/31/2017 | No |
| Issuer 4 | Warrant Fund | | | 0 | 381,642,544 | 381,642,544 $922,689 | $204,169.89 | 6/25/2018 – 7/6/2018 | No |
| Issuer 5 | Warrant Fund | | | 0 | 527,778 | 527,778 $412,241 | $81,691 | 7/11/2018 – 7/12/2018 | Yes. Naked short sold 400,150 shares in advance of a warrant conversion price reduction effective July 12, 2018, and exercised warrants *after* the conversion price reduction. |
| Issuer 6 | Warrant Fund | | | 7,638,623 | 0 | 4,596,514 $329,597 | $83,222 | 7/20/2018 – 7/23/2018 | No |

1

**APPENDIX A**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Issuer 7 | Warrant Fund | | | 210,939 | 0 | 196,262 $343,226 | $341,184 | 2/25/2019 – 3/5/2019 | No |
| Issuer 8 | Warrant Fund | | | 119,181 | 0 | 119,181 $944,101. | $345,242. | 5/1/2019 – 5/6/2019 | No |

2